IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-00761-WYD-KLM

RICHARD D. KELLAR,

      Plaintiff,

v.

UNITED STATES DEPARTMENT OF VETERAN'S AFFAIRS, a federal agency of
United States,

      Defendant.

---

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

## I.    INTRODUCTION

THIS MATTER came before the Court for a bench trial from August 17, 2010, to

August 19, 2010.  This Court has jurisdiction under the Federal Tort Claims Act, 28

U.S.C. § 1346(b), 28 U.S.C. § 2671 *et seq.*  After carefully considering the evidence, the

pleadings, the arguments of counsel and the relevant legal authorities, the Court makes

the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).[1]

## II.    BACKGROUND

This is a civil action for damages for personal injury caused by surgeons and

other medical personnel employed by Defendant, the United States Department of

---

[1]To the extent that any of the findings of fact might constitute conclusions of law,
they are adopted as such. Conversely, to the extent that any conclusions of law
constitute findings of fact, they are adopted as such.

Veterans Affairs. Defendant's agents left a surgical clamp in Plaintiff's chest following a surgery that took place on August 30, 2005. Defendant has admitted that the surgical clamp was negligently left in Plaintiff's body, but it denies that the clamp has caused Plaintiff any damages. Plaintiff contends that the clamp has caused him sever financial hardship and psychological damages. Because the Defendant has conceded negligence, the only issues left to be determined are causation and damages.

III.     FINDINGS OF FACT[2]

The United States Department of Veterans Affairs ("VA") is an agency of the United States. The Veterans Health Administration, an administration of the VA, is responsible for providing veterans with health care, specialized care, and related medical and social support services.

Plaintiff, Richard D. Kellar is a 61-year-old man, and a formerly self-employed painting and drywall contractor. Plaintiff is married and has an adult daughter. Plaintiff served in the military for approximately five years beginning in 1969, and was honorably discharged. Plaintiff is receiving medical benefits from the VA.

On June 18, 2005, Plaintiff was seen in the Denver VA Emergency Room ("ER") with complaints of lower back pain and numbness in his legs, especially his left leg. *See* Exhibit A01. The ER referred Plaintiff to a VA primary care provider to address Plaintiff's high blood pressure and back pain. Plaintiff's primary care provider

---

[2]This memorandum and order assumes complete familiarity with the record of proceedings and all evidence in the case. The law which governs this case is well settled and the Court's decision is essentially a fact-based one under Colorado negligence law. The Court will let the record speak for itself and discuss the evidence only to the extent necessary to frame the basis for its legal conclusions.

prescribed Plaintiff medications and, based on Plaintiff's complaints of chest pain, referred Plaintiff for an exercise stress test and an echocardiogram. The primary care provider also referred Plaintiff to a neurologist for his lower back pain. On August 5, 2005, Plaintiff went to a VA medical facility in Colorado for an exercise stress test. However, the test had to be stopped because of Plaintiff's increased blood pressure and shortness of breath. The results of the stress test indicated that Plaintiff had limiting chest pain and ischemia (decreased blood flow in his heart). To further evaluate the results of the exercise stress test, on August 16, 2005, Plaintiff underwent a procedure called cardiac catheterization. *See* Exhibit A01. The results of the cardiac catheterization indicated that Plaintiff had significant narrowing of the blood vessels (stenosis) in his heart. A coronary artery bypass grafting ("CABG") procedure, commonly known as bypass surgery, was recommended. Plaintiff agreed to the surgery.

      A.    <u>CABG Procedure, Generally</u>:

In a CABG procedure, arteries or veins from other parts of the patient's body are grafted to the at-risk coronary artery to bypass the narrowed area in the artery. The surgery is performed with the chest opened (by cracking the sternum, or breastbone, and opening the ribcage) and the heart stopped. Because the patient's heart is stopped, the patient is placed on cardiopulmonary bypass during the procedure. Cardiopulmonary bypass is a technique that mechanically takes over the functioning of the heart and lungs.

During a CABG procedure, miniature clamps are used to hold the veins and arteries closed while the grafting procedure is performed. These clamps are made out

of stainless steel and are known as Serafin or bulldog clamps. They are less than 5 centimeters (or just over one inch and three-quarters) long, and are designed to minimize injury or damage to the tissue they clamp. They resemble tweezers, and have blunt, rounded edges. During a CABG procedure, the sponges, instruments, and other items (such as needles and scalpel blades) used during the surgery are counted as they are used to ensure that all items are accounted for at the end of the surgery, and that no items were left inside of the patient. At the end of the procedure, the patient's sternum must be closed with stainless steel wire, which remains inside the patient permanently. Normal recovery time from a CABG procedure is from four to twelve weeks.

B.      Plaintiff's CABG Procedure:

On August 30, 2005, Plaintiff underwent a CABG procedure at the VA Medical Center in Denver, Colorado. Dr. Frederick L. Grover was the attending surgeon. Dr. Grover is a VA surgeon whose duties including acting as an attending surgeon, and performing cardiothoracic surgery, primary cardiac surgery, and heart surgery. During Plaintiff's CABG procedure, three narrowed arteries were bypassed, making Plaintiff's procedure a triple bypass. The surgery lasted approximately six hours and thirty minutes. Plaintiff was 56 years old at the time of the surgery.

During Plaintiff's CABG procedure, Plaintiff's three cardiac arteries were grafted/bypassed without complications, and Plaintiff was on cardiopulmonary bypass for two hours and thirty minutes without complications. At the end of Plaintiff's surgery, but before Plaintiff's chest had been closed, the instrument count revealed five Serafin clamps. The initial count indicated that six had been used. Pursuant to standard procedure, the operating room was searched for the missing clamp. When the clamp

was not discovered, the doctors also physically searched within Plaintiff's chest where it was open for the surgery.  In addition, a portable x-ray was taken of Plaintiff's chest to see if the missing clamp was inside of Plaintiff.  Both Dr. Grover, the lead surgeon, and the resident surgeon who performed the surgery read the portable x-ray to see if the clamp was within Plaintiff, but they did not identify the clamp at that time.  Although the clamp remained missing, Plaintiff's chest was then closed (by sewing the sternum together with permanent stainless steel wire that was left inside Plaintiff to hold the sternum together), ending Plaintiff's CABG procedure.  As is customary with a CABG operation, Plaintiff was taken to the Intensive Care Unit (ICU) for recovery.

Plaintiff was discharged on September 4, 2005, in stable condition.  Defendant's agents did not inform Plaintiff of the missing clamp at that time.

C.    Plaintiff's Discovery of the Retained Clamp:

On September 16, 2005, two weeks after the surgery, Plaintiff was evaluated for complaints of weight gain and fluid retention.  *See* Exhibit A01.  He was diagnosed with mild heart failure, treated, and released after an overnight stay.  At this time, Plaintiff did not complain of chest pain or shortness of breath.  He returned to the VA several times in October, November, December and February for follow-up care related to his surgery.  *See* Exhibit A01.

Sometime in 2006, Plaintiff began to experience lower back and neck pain and was referred to Sky Ridge Medical Center in Lone Tree, Colorado for an MRI on March 20, 2006.  During the MRI, medical personnel at Sky Ridge discovered that the missing Serafin clamp had been retained inside of Plaintiff, and informed Plaintiff of the discovery.  Plaintiff contacted the VA and was told to go to the emergency room.  On

March 24, 2006, Plaintiff was seen in the VA ER with complaints of chest pain that started on March 20, 2006, following the MRI at Sky Ridge.  *See* Exhibit A01.  Plaintiff also complained of shortness of breath starting on March 20, 2006.  Plaintiff was admitted to the hospital for observation and to rule out a heart attack.

On March 24, 2006, Plaintiff received a chest x-ray at the VA.  The x-ray revealed that the retained clamp was located in the space behind Plaintiff's heart.  Plaintiff met with Dr. Grover who informed him that the clamp was left in his body following his surgery in August 2005.  On March 27, 2006, Dr. Grover ordered a fluoroscopy (an x-ray that captures movement) to further define the location of the retained clamp and an exercise stress test.  Dr. Grover informed Plaintiff about these further tests as well as the risks of removing the retained clamp.  On March 28, 2008, Plaintiff underwent the fluoroscopy study of the retained clamp.  The test revealed that the clamp was located in the chest cavity behind the heart, and that the clamp was not attached to the heart or any of the grafted arteries.  *See* Exhibit A01 & A03.

On April 21, 2006, Plaintiff underwent the exercise stress test.  Plaintiff had no chest pain during the test and the results of the test indicated that Plaintiff had normal functional capacity.  Because the clamp was not impinging on any of the grafts and not interfering with Plaintiff's activity, the VA cardiac surgeons believed that the risk of another surgery to remove the clamp outweighed the risk of leaving the clamp in place.  *See* Exhibit A01.

In a follow-up consult with Dr. Grover, Plaintiff was informed that because of the length of time the clamp and been inside Plaintiff's body, scar tissue had formed around the clamp making it difficult to remove.  Dr. Grover also informed Plaintiff that, unlike

shrapnel, the retained clamp had soft edges and because it was encased in scar tissue it was unlikely to move or cause Plaintiff any medical complications, and that it was not dangerous. The clamp is made from the same stainless steel material as the permanent surgical wiring that was used to close Plaintiff's sternum after the CABG procedure. *See* Exhibit A01.

The retained clamp was not discovered during any of the examinations of Plaintiff conducted at the VA or elsewhere between August 30, 2005, and March 20, 2006. The VA was not aware of the retained clamp until after the MRI conducted on March 20, 2006.

      D.    <u>Plaintiff's Damages</u>:

      1.    <u>Economic Damages</u>:

Plaintiff has not worked since July 2005, approximately one month before the surgery. As a veteran eligible for free health care from the VA, Plaintiff has not paid for the medical care he has received at the VA. Plaintiff and his wife filed for Chapter 13 bankruptcy in April 2004 (the "2004 bankruptcy"), approximately one year and four months before the surgery. *See* Exhibit A04. The District Court in Douglas County, Colorado, issued an order authorizing the sale of Plaintiff's home, located at 20319 Parker Vista Circle in Parker, Colorado, on April 29, 2005, four months before the surgery. *See* Exhibit A05. Plaintiff's home was eventually sold at public auction on January 11, 2006. *See* Exhibit A06. Plaintiff and his wife filed for Chapter 13 bankruptcy again in May 2005 (the "2005 bankruptcy"), approximately three months before the surgery. *See* Exhibit A07.

Plaintiff has filed two claims for disability benefits (to the Social Security Administration ("SSA"), and the VA), in which Plaintiff asserted that he could not work. On June 26, 2006, Plaintiff filed an application for Disability Insurance Benefits with the SSA. *See* Exhibit A15 & A16. Plaintiff asserted that his ability to work was limited by: "triple bypass, open heart surgery, congestive heart failure, gout, torn meniscus right knee, left knee injury, lower back injury, degenerative disc disease, hernia right side, high blood pressure, acid reflux disease, osteoarthritis." Plaintiff further asserted that the retained clamp restricted his physical abilities. However, in his disability report to the SSA, Plaintiff alleged that his disability began on July 1, 2005, which was almost two months before his CABG procedure on August 30, 2005. On June 11, 2007, the SSA found that Plaintiff was entitled to a period of Disability Insurance Benefits based on his impairments related to the CABG procedure, degenerative joint and disc disease, gout, and a hernia. The SSA found that Plaintiff was entitled to benefits dating back to July 1, 2005, before his surgery. *See* Exhibit A16.

Plaintiff did not report these benefits to the VA. On September 15, 2005, before he had applied for SSA benefits, Plaintiff filed a "Veteran's Application for Compensation and/or Pension," claiming that his heart disease, lower back, and knee pain were disabilities that prevented him from working. *See* Exhibit A08. In Part B of Plaintiff's Application to the VA, Plaintiff stated that his disability began on August 17, 2005, or two weeks before his surgery. *See* Exhibit A08. In Part D of his Application, Plaintiff stated that his disability began on July 1, 2003, over two years before his surgery. *See* Exhibit A08. On December 8, 2005, Plaintiff submitted a "Statement in Support of

Claim" for his "Veteran's Application for Compensation and/or Pension," in which he stated that he was:

> admitted for triple bypass for heart disease on 8/30/05. I spent one week in hospital. A week later I was admitted for congestive heart failure and kept overnight. I am also receiving treatment for high cholesterol, high blood pressure, gout, back pain, arthritis, right knee pain, hernia, skin rash, ankle pain.

*See* Exhibit A09. On June 21, 2006, Plaintiff submitted a supplemental "Veteran's Application for Compensation and/or Pension," in which he stated that the "DVAMC left a vascular clamp in my chest and is sharp on both ends and is about 1/4 inches from my heart." *See* Exhibit A10. On January 5, 2007, Plaintiff underwent a physical examination for his Compensation and Pension application. The Compensation and Pension exam evaluated the following ailments Plaintiff claimed towards his disability pension: coronary artery diseases, bypass surgery, high blood pressure, gout, hernia, skin rash, arthritis (ankles, knees, hips, hands), degeneration of the spine, torn knee ligaments, ankle fractures, and varicose veins. *See* Exhibit A11.

On February 22, 2007, the VA issued its Ratings Decision on Plaintiff's "Veteran's Application for Compensation and/or Pension." The decision found that Plaintiff was entitled to a nonservice connected pension, including a special monthly pension, based on his disability of congestive heart failure due to hypertensive heart disease. The decision denied Plaintiff any compensation due to the retained clamp, and concluded that Plaintiff did not have any additional disability from the clamp. *See* Exhibit A12 & A13. The VA found that Plaintiff was entitled to benefits dating back to September 21, 2005, the date they initially received Plaintiff's claim. *See* Exhibit A12 &

A13. As part of his entitlement to VA benefits, Plaintiff had a duty to report his income to the VA, including benefits from the SSA. *See* Exhibit A13. In June 2008, based on information the VA received from the SSA regarding Plaintiff's SSA benefits, the VA suspended Plaintiff's VA benefits. *See* Exhibit A14.

As set forth above, Plaintiff has not worked since July, 2005, approximately one month before the surgery. As a result of his inability to work, Plaintiff and his family have suffered financially. However, Plaintiff, at trial, did not show that his inability to work is in any way related to the retained clamp. Plaintiff did not demonstrate that the loss of his home at 20319 Parker Vista Circle in Parker, Colorado, or the loss of any of the items listed as real or personal property in the 2004 bankruptcy and the 2005 bankruptcy, both of which occurred prior to his surgery, were related to or caused by the retained clamp.

Plaintiff did not present any evidence that the retained clamp inhibited his recovery from the surgery, prevented him from working after surgery, or exasperated his claimed disability. Moreover, even if the retained clamp contributed in some way to Plaintiff's inability to resume work after the surgery, Plaintiff did not present any evidence of the value of his prior income, or the present value of that income, or how that income might be off-set by his current social security benefits. Plaintiff did not present any evidence of economic damages related to the retained clamp.

2. <u>Medical Damages</u>:

Plaintiff suffered from preexisting several medical conditions for many years prior to the CABG procedure including gout, arthritis, back pain, acid reflux, high blood pressure, and a hernia. *See* Exhibit A01. Plaintiff testified that prior to his surgery he

led what he described as a "pretty active" life-style. He was a licensed scuba diver, and enjoyed the mountains, artwork and caring for his three dogs. Plaintiff testified that since he discovered the retained clamp, he experiences shooting pains that run through the back of his head and neck, weakness, weight loss, balance problems and numbness in his hands. However, Plaintiff has not presented any evidence that these symptoms are related to the retained clamp, as opposed to Plaintiff's other medical conditions. Plaintiff has not sought a second opinion, nor did he present any evidence demonstrating that the retained clamp has caused him any medical harm, or that it is likely to do so in the future.[3] In addition, there is no evidence in the record that the retained clamp exacerbated any of Plaintiff's preexisting medical conditions, or that it impacted Plaintiff's recovery from the CABG procedure.

      3.    <u>Non-Economic Damages</u>:

Following discovery of the retained clamp, Plaintiff experienced feelings of intense anger, frustration, and hopelessness. His relationship with his wife began to deteriorate, and he experienced feelings of helplessness and he became fearful of dying and losing his family. Plaintiff feared that if he fells down stairs, dove into water, or was rear-ended by a car, the clamp might become dislodged and cause him harm. Plaintiff continues to experience these fears today. Plaintiff describes his life following discovery of the retained clamp as devastating. Both Plaintiff's wife and daughter

---

[3]Plaintiff testified that his primary care doctor at the VA expressed concerns to him about the clamp, but stated that she would not testify because she was not a cardiologist. Plaintiff admitted that this doctor was not a neurologist and did not conduct any tests to determine whether the retained clamp was responsible for Plaintiff's symptoms.

testified that after Plaintiff's discovery of the retained clamp he is more fearful, anxious and stressed. Plaintiff acknowledged that medical professionals at the VA have told him that the clamp will not cause him harm because it is encased in scar tissue. Plaintiff acknowledges that he has been told by cardiologists at the VA that his fears of death or injury will not materialize, but he refuses to believe these doctors.

a.    Dr. Gammons:

Plaintiff offered Dr. Deneen Renea Gammons as an expert witness to testify as to Plaintiff's alleged psychological injuries. In April, 2008, Dr. Gammons began treating Plaintiff at the request of Plaintiff's counsel.[4] Over Defendant's objection, Dr. Gammons was qualified as an expert and permitted to opine as to the difference between an individual who has post traumatic stress disorder (PTSD) and an individual who is malingering. Dr. Gammons was also permitted to give opinions about her evaluation of Plaintiff.

At the time Dr. Gammons began treating Plaintiff, she was completing her post-doctorate internship under the supervision of a licensed clinical social worker, but she was neither a licensed psychotherapist nor a licenced professional counselor in the state of Colorado. Dr. Gammons testified that she provided counseling to Plaintiff through the months of May, June and July of 2008, and that most of her interaction with Plaintiff took place via telephone. As part of her treatment of Plaintiff, Dr. Gammons'

---

[4]Dr. Gammons has a bachelor of science degree in rehabilitation counseling, a master of education in school counseling, a master of arts in educational leadership, and a doctorate of psychology with an emphasis in educational and developmental psychology. She received her Ph.D. from an on-line psychology program at Capella University, which is not accredited by the American Psychological Association. She is certified as a school counselor and a school administrator.

internship supervisor, Laurence Botnick, administered diagnostic testing to Plaintiff including a test referred to as the Minnesota Multiphasic Personality Inventory, or MMPI. In addition to her sessions with Plaintiff, Dr. Gammons interviewed Plaintiff's wife and daughter.

Dr. Gammons opined that, as a result of Plaintiff's discovery that Defendants had left the surgical clamp in his chest, he struggled with depression, withdrew from his family and friends, and suffered financial difficulties. Dr. Gammons testified that Plaintiff complained to her of fears that the clamp would puncture a hole in his heart or and artery, cause a cancerous growth, blood poisoning or some other type of internal infection. Based on Plaintiff's concerns, and other information gleaned from her counseling sessions with Plaintiff, Dr. Gammons opined that Plaintiff's discovery of the clamp was a traumatic event that caused him to develop PTSD, pursuant to the criteria set forth in the diagnosis and statistical manual for mental disorders, referred to as the DSM-IV. Dr. Gammons also diagnosed Plaintiff with an anxiety disorder. She further opined that Plaintiff was not malingering based on the fact that Defendant had not properly informed Plaintiff of the existence of the clamp and because, according to her, Defendant had no intention of ever informing Plaintiff that the clamp had been left in his chest. Dr. Gammons also opined that Plaintiff would benefit from continued individual psychotherapy and family counseling.

During cross-examination, Dr. Gammons admitted that Plaintiff did not meet all six criteria set forth in the DSM-IV with respect to making a diagnosis of PTSD, but she opined that not all six criteria had to be met prior to rendering a PTSD diagnosis. In addition, Dr. Gammons admitted that while PTSD must either be classified as acute or

chronic, she diagnosed Plaintiff's PTSD as "general." Dr. Gammons also admitted that

in diagnosing Plaintiff she did not focus on any other problems or issues Plaintiff was

experiencing at that time other than his discovery of the clamp, and that she did not

consider the possibility that Plaintiff could be improperly attributing some preexisting

injuries to his discovery of the surgical clamp.

Finally, Dr. Gammons admitted that she did not receive payment for treating

Plaintiff, but agreed to treat him on a "contingency fee basis." As a result of this

arrangement, Dr. Gammons will not be paid for her work unless I find that Plaintiff has

suffered compensable injuries flowing from the Defendant's negligence.

    b. <u>Doctor Bursztajn</u>:

The Government offered Dr. Bursztajn as an expert in forensic psychology and to

rebut the testimony of Dr. Gammons. Dr. Bursztajn is a physician who specializes in

psychiatry, and is a clinical associate professor of psychiatry at Harvard Medical

School.[5] He was qualified as an expert in the field of neuropsychiatry. Dr. Bursztajn

performed an independent neuropsychiatric evaluation of Plaintiff designed to determine

whether Plaintiff suffered from any neuropsychiatric impairment as a result of the

retained clamp. Dr. Bursztajn reviewed Plaintiff's medical and military records and

conducted an examination of Plaintiff which included an unstructured interview, a

structured interview, and objective psychological testing. Dr. Bursztajn met with Plaintiff

---

[5]Dr. Bursztajn has a bachelor of arts degree from Princeton University, and a
M.D. from Harvard Medical School. He has extensive postdoctoral training, multiple
certifications and licenses, and has authored numerous publications.

for approximately six hours. He did not perform a DSM-IV diagnoses in the course of his evaluation of Plaintiff.

Dr. Bursztajn opined that the retained clamp is not a substantial cause of Plaintiff's neuropsychiatric impairments. He further opined that Plaintiff misattributes and exaggerates his pain. According to Dr. Bursztajn, Plaintiff's preexisting and ongoing medical concerns lead him to identify as a patient and assume a "sick role" that in turn causes him to believe that he is entitled to compensation, and causes him to avoid taking responsibility for his genuine psychological impairments.

IV.    CONCLUSIONS OF LAW

The Court has jurisdiction over the claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-80. Under the FTCA, the United States may be held liable for damages caused by the negligence or wrongful act or omission of an employee of the government acting within the scope of his employment under circumstances where the United States, if a private person, would be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). In actions under the FTCA, the Court must apply the whole law of the state where the negligent act or omission occurred. *See Richards v. United States*, 369 U.S. 1, 11 (1962). The accident in this case occurred in Colorado and, therefore, Colorado law applies.

To establish negligence under Colorado law, a plaintiff must show (1) legal duty the defendant owes to the plaintiff; (2) the defendant's breach of that duty; and (3) an injury to the plaintiff that is (4) proximately caused by the defendant's breach. *Dotson v. Bernstein*, 207 P.3d 911, 913 (Colo. App., Mar. 5, 2009); *see also Lininger v.*

-15-

*Eisenbaum*, 764 P.2d 1202, 1205-08 (Colo. 1988).  Under Colorado law, Plaintiff has the burden of establishing a *prima facie* case of negligence.  *Holmes v. Gamble*, 624 P.2d 905, 906 (Colo. App. 1981).

In these proceedings, Plaintiff asserts a single claim for relief for negligence based on *res ipsa loquitur*.  *Res ipsa loquitur* is a rule of evidence that gives rise to a rebuttable presumption of the defendant's negligence but does not create a substantive claim for relief.  *Stone's Farm Supply, Inc. v. Deacon*, 805 P.2d 1109, 1114 (Colo. 1991).  Here, Defendant does not contest that a Serafin surgical clamp was left in Plaintiff's chest during the CABG procedure on August 30, 2005.  Moreover, Defendant does not contest that by leaving the Serafin surgical clamp in Plaintiff's chest during the CABG procedure, Defendant did not meet the standard of care.  Defendant has admitted breach of a legal duty to Plaintiff, but has denied that Plaintiff suffered any injury proximately caused by this breach.  Therefore, Plaintiff has the burden of proving that he has suffered injury, and that the proximate cause of that injury is the failure of Defendant to remove the surgical clamp following the CABG procedure on August 30, 2005.

Plaintiff's potential damages are capped by Colorado law.  C.R.S. § 13-64-302 provides that the total amount recoverable in a medical malpractice action "shall not exceed" $1,000,000, of which "not more than" $300,000 shall be attributable to non-economic injury.  *See* C.R.S. §§ 13-64-302(1)(a)-(c).  This cap can be increased for economic damages upon a finding by the court that the present value of past and future economic damages would exceed the cap and that the application of the cap would be "unfair."  *Id.* at § 13-64-302(1)(b).  Thus, without exceeding the cap, and assuming the

maximum amount of non-economic injury, the maximum award a plaintiff could receive in a medical malpractice case would be $700,000 in economic damages (i.e., lost income, medical expenses, or other out-of-pocket or lost financial opportunities) and $300,000 in non-economic damages (i.e., pain and suffering, emotional distress, and loss of enjoyment of life).

Plaintiff has not demonstrated that he suffered any economic injury or damages that were proximately caused by Defendant's failure to remove the clamp following the CABG procedure. I find that Plaintiff presented no evidence that the retained clamp caused him any economic injury or damages in the form of lost income, additional medical expenses or other consequential economic damages. Specifically, Plaintiff had stopped working before the CABG procedure, and had filed for bankruptcy over one year before the CABG procedure. In addition, Plaintiff filed for, and received, disability benefits from both the VA and the SSA based on his inability to work. These benefits were premised on conditions unrelated to the retained clamp, and dated back to a time frame before Plaintiff was even aware of the retained clamp. In addition, Plaintiff did not provide any evidence of additional medical bills he incurred as a result of the retained clamp. While Plaintiff testified that he would like to have the clamp removed, he agreed that all of the medical professionals with whom he has consulted believe that it would be too dangerous and would put Plaintiff at risk of incurring additional injury. Because Plaintiff has failed to show that the retained clamp caused Plaintiff any economic injury or lost income or other consequential economic damages, Plaintiff is barred from recovering any economic damages for lost income or other consequential economic damages from Defendant.

Under Colorado law, non-economic damages generally include losses described as pain and suffering, loss of enjoyment of life and emotional distress. 7A Colo. Prac. § 37.8 (2d ed. 2010); *see also Pringle v. Valdez*, 171 P.3d 624, 628-30 (Colo. 2007) (legislature's use of the phrase "pain and suffering" in seatbelt statute was intended to encompass all forms of noneconomic damages); *Giampapa v. American Family Mut. Ins. Co.*, 64 P.3d 230, 241-42 (Colo. 2003) (recognizing that courts use the terms "emotional distress" and "mental anguish" interchangeably).

Regarding non-economic damages, I find that Plaintiff has demonstrated that his discovery of the retained clamp caused or contributed to his psychological harm, causing ongoing pain and suffering, loss of enjoyment of life and emotional distress. Plaintiff presented evidence of the anxiety and emotional distress he suffered upon discovery of the retained and clamp, and for the week following this discovery prior to the time he was able to speak with medical professionals regarding his prognosis and whether the clamp could be removed. I find that Plaintiff suffered additional distress and anxiety upon learning that the clamp could not be safely removed, and that it would likely remain in his body for the remainder of his lifetime.

Much of Plaintiff's ongoing anxiety and depression is the result of his fear that the retained clamp will one day cause him serious physical harm, or death. While I find that these fears were reasonable at the onset of his discovery of the clamp, I also find that these fears become less reasonable over time. It is undisputed that, except for some statements made by Plaintiff's primary care physician who is not a neurologist or a cardiologist and did not testify, the medical personnel Plaintiff has consulted with

following discovery of the retained clamp have uniformly informed Plaintiff that the clamp will not cause him any future physical injury.

I appreciate Plaintiff's reluctance to rely solely on the opinion of the medical personnel employed by Defendant. However, Plaintiff admitted that he has not sought a second opinion from a doctor outside of the VA hospital, that he has no medical basis for his belief that the clamp will cause him harm, and that he simply refuses to believe the opinion of medical professionals who have told him otherwise. Plaintiff has not presented any evidence that the retained clamp has affected his physical health or physical well-being now or in the future. I conclude that the clamp could not be responsible for any of the physical symptoms of which Plaintiff now complains.

Although I find Plaintiff is entitled to recovery of non-economic damages, I specifically decline to find that Plaintiff is suffering from a diagnosable psychiatric disorder, such as PTSD or an anxiety disorder. Even if Dr. Gammons correctly diagnosed Plaintiff with PTSD or an anxiety disorder, I find that these disorders are not directly related to the retained clamp. The credibility of Dr. Gammons' testimony is severely compromised by the revelation that she treated Plaintiff on a contingency fee basis. The fact that Dr. Gammons entered this type of fee arrangement with Plaintiff gave her a personal financial incentive to opine that Plaintiff has suffered injuries related to the clamp, as well as an incentive to opine that these injuries are serious and ongoing. As such, I give her testimony limited credence.

In addition, while I find that Plaintiff is entitled to recover for pain and suffering and emotional distress associated with his fear of an increased risk of future harm, I also find that his fears must be reasonable under the circumstances. *See Boryla v.*

*Pash*, 960 P.2d 123, 128 (Colo. 1998). It is undisputed that in the five years since Plaintiff's surgery in August, 2005, none of Plaintiff's fears has materialized. While Plaintiff's fears may have been reasonable at the onset of his discovery of the retained clamp, as time passes, his fears and any associated depression, anxiety and loss of enjoyment of life stemming from those fears, become less and less reasonable. I find that Plaintiff's damages were greater during the first year following his discovery of the retained clamp in March, 2006, and have diminished each year following his discovery. I find that Plaintiff is likely to suffer some measure of pain and suffering and emotional distress in the future, but that these damages will continue to diminish with each passing year.

I agree with Defendant that the majority of Plaintiff's medical and psychological complaints preexisted his surgery. However, I disagree with Defendant's contention that Plaintiff cannot demonstrate that the clamp caused him any emotional injury because he did not complain of any emotional symptoms until discovery of the retained clamp. It was Plaintiff's discovery of the clamp in his body and his subsequent discovery that the clamp could not be removed that caused him damage.

Based on the foregoing, I find that Plaintiff is entitled to an award of non-economic damages in the amount of $130,000.00. Because pain and suffering are difficult to measure, the Colorado Supreme Court has approved of counsel translating this loss by breaking down the total monetary request to a per diem or time segment based on the life expectancy of the plaintiff. *Newbury v. Vogel*, 151 Colo. 520, 525-27, 379 P.2d 811, 813-14 (Colo. 1963). While Plaintiff's counsel did not provide such a

breakdown in this case, I will set forth my process of mathematically calculating Plaintiff's damages.

First, I find that Plaintiff is entitled to damages from the time following his discovery of the clamp in March, 2006, to present as follows, consistent with decreasing the value of the damages as noted in my verbal ruling at the end of the trial and as memorialized in this Order:

First Year - $60,000.00

Second Year - $30,00.00

Third Year - $15,000.00

Fourth Year - $7,500.00

Fifth Year - $3,750.00

Based on the mortality table found at C.R.S. § 13-25-103, Plaintiff's life expectancy is approximately an additional 20 years.[6]  Therefore, I have awarded an additional $13,750.00, or approximately $690.00 per year, based on Plaintiff's projected life expectancy.

V.    CONCLUSION

Based upon the foregoing, I find in favor of Plaintiff on his claim for negligence based on *res ipsa loquitur*.  Accordingly, it is

---

[6]Pursuant to C.R.S. § 13-25-102, "[i]n all civil actions, special proceedings, or other modes of litigation in courts of justice or before magistrates or other persons having power and authority to receive evidence, when it is necessary to establish the expectancy of continued life of any person from any period of such person's life, whether he is living at the time or not, the table set out in section 13-25-103 shall be received as evidence, together with other evidence as to health, constitution, habits, and occupation of such person of such expectancy."

ORDERED that the Clerk of Court shall enter judgment in favor of Plaintiff and against the Defendant on the claim of negligence in the amount of $130,000.00.  It is

FURTHER ORDERED that post-judgment interest shall accrue from the date of judgment at the rate permitted by law.[7]

Dated:  September 17, 2010

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge

---

[7]In announcing my decision at the conclusion of the bench trial, I stated that Plaintiff was entitled to an award of pre-judgment interest.  Defendant subsequently filed a Notice of Authority Under Federal Tort Claims Act Regarding Prejudgment Interest, ECF No. 208, indicating that Defendant is not liable for pre-judgment interest under the FTCA.  *See* 28 U.S.C. § 2674; *see also Wilkinson v. United States*, 564 F.3d 927, 933 (8th Cir. 2009).  Therefore, no pre-judgment interest shall be awarded in this case.